## COMMONWEALTH *v.* J. S. JONES.

[Surcharge obtaining money under false pretences.]

JUNE 24th, 1843, the RECORDER gave the following opinion :

In conducting the investigation of the charge preferred in this case, a very wide margin has been given to the counsel on both sides; while the case itself, as I regard it, rests on a single point of law, arising from the evidence. The material facts, collected from the mass of testimony introduced, which are presented as the basis of this proceeding, are simply these :

The defendant having proposed, at his own expense, to give a concert for the benefit of the survivors of the Dartmoor prisoners, and a volunteer military company; took advantage of the late sojourn in Philadelphia, of the chief executive of the union, and the governor of this state, to secure their attendance on the occasion, as an additional cause of attraction for the public. Having made his arrangements to that effect, he calls on Mr. Samuel Sutton, the prosecutor, and states to him the proposed object, and desires to know from him, what sum of money he will give as a bonus for the privilege of furnishing the refreshments necessary and usual at such exhibitions. Several interviews were had between the parties, at all of which the defendant paints in glowing colours, the success which will attend the undertaking. Mr. Sutton is induced, by these

statements, to make an offer of fifty dollars, which was refused; as the sum asked was one hundred dollars. Mr. Jones called, finally, on Mr. Sutton, and stated to him that a man had offered seventy-five dollars, to be paid after the concert; but as cash was desirable, if he still was willing to give the sum he offered in cash, he should have the contract or privilege. It was agreed to, and the money paid. Mr. Sutton distinctly and positively swears, this statement of Mr. Jones, that an offer as stated, had been made of the seventy-five dollars, alone induced him to pay the fifty dollars to the defendant, in cash.

The concert took place and was a decided failure. Instead of 4000 persons being present, including a large body of military, (the second brigade, being, as the defendant stated, under his orders after the line was broken, and would be marched to the concert, and would require large quantities of refreshments), as was repeatedly represented by Mr. Jones, only nineteen dollars and fifty cents were received at the door, on the evening in question. So opposite to the predictions, was the result of the concert, and so great the loss to Mr. Sutton, as he had provided at the request, and from the various statements of the defendant, a large supply of refreshments, which not being consumed, was the cause of the loss, and having advanced the sum for the privilege thus obtained, Mr. Sutton called on Mr. Jones to request him to refund the bonus paid. Mr. Jones stated that if he had it he would, but he was unable to do so, as he had also lost much money in the enterprise. Under all these circumstances, this prosecution is instituted under the 21st section of the act

9

of 12th of July, 1842, entitled, "An act for the abolishment of imprisonment for debt," &c.

In the case of the Commonwealth *v*. Smith, I decided that in order to sustain a charge under the provisions of this act, "four ingredients are necessary." These are :

1st. "Every person who, with the intent to cheat or defraud another,

2d. "Shall designedly,

3d. "By colour of any false token or writing, or by any false pretence whatsoever,

4th. "Obtain from any person any money, personal property, or other valuable thing—then he has committed the crime known as obtaining property under false pretences." "Its first and second ingredients must be substantiated by the facts or direct inferences derived therefrom. The third is a mixed question of law and fact, and the last is for a jury to determine."

These are still my convictions, although, at the time they were expressed, no decision had been given on the law, in our state.

Let us compare this case, then, with the standard thus established, as the criterion by which to decide, if it falls within the provisions of the act.

The defendant certainly did obtain the money of Sutton, and, so far as appears on this hearing, notwithstanding every opportunity was afforded him to offer all the testimony in his power, by colour of a false pretence; the person who offered the seventy-five dollars, if any such there is, never has been produced, nor has his absence been explained. Indeed, it is not pretended that any such offer ever was made, for, instead of

the production of so material a witness, it appears that after the first hearing in this case, the defendant goes to Mr. Simpson, in Third street near Queen, and showing him an "announce bill" of the late concert, desires to know how much he would give for the refreshments' bar on the evening of the performance. Mr. Simpson is produced as a witness of the defendant, and he states, that having been informed that the concert was about to take place, and on certain conditions being made, he would give fifty dollars for the bars. This is a pregnant fact in connexion with the intent to deceive. It must be remembered that this was the voluntary act of the defendant, and in what manner it was calculated to benefit him, or disprove the charge, I am at a loss to determine.

This statement of the defendant that such offer had been made, was the prominent inducement offered, which caused Sutton to advance the money. The money was obtained. Both these facts are in evidence, from the clearest proof. It is not only legal, but just, to infer from the testimony that this statement of the defendant was false. If, then, it be false, and it is one of a class of pretences designated in the words of the act, as "any false pretence whatsoever," two of the ingredients referred to, are established. The "intent" in the one, and "design" in the other remaining two ingredients, are to be "inferred" and decided upon by a jury. The motives for men's actions are not easily proven, and they can, in most cases, only be discovered by acts which develope them. The "intent" to cheat and defraud, therefore, while it has a direct bearing on the above case, cannot be positively and directly

proven. It exists, if at all, from the inference or deductions from the facts of the case. To attempt to make it apparent by evidence, would be almost impossible, in nearly every case; as much so as to show malice in murder by positive testimony. No court has ever yet charged a jury, that the design for violating law must be substantially proven to its satisfaction, before the prisoner could be convicted. The intent to do wrong must be deduced from the facts, and to decide on the existence or non-existence of this ingredient, is the sole province of a jury. No other power can usurp this prerogative; to do so is to violate every principle of law; and the first encroachment effected under any pretence, is the first step towards weakening that constitutional shield of protection thrown alike around the community and the accused. It should be the duty, as well as the strong desire of every magistrate, to uphold and strengthen the rights of juries; to assail or interfere with which will be but to transform the criminal law into a despotism. No citizen should be so respectable or so mean, as to be above or below the operation of the known and well established principles of law, the theory of which is, that all are equally amenable for wrongs committed. If Mr. Jones had the intent to cheat Mr. Sutton, a jury, and a jury only, can so decide. It is no part of my province, or that of any other justice, to do more than determine if there is probable cause to believe such intent existed.

I have said that under this classification, the third feature presents a mixed question of law and fact. As to what constitutes a false pretence, in law, under the very general terms of the act, has been decided, posi-

tively, by our county court.    Before that decision I held
that :

"A mere naked lie, however base and dishonourable,
is neither a false token, or writing, or any false pre-
tence.    If it be beyond reasonable prudence to credit,
the error may be in the credulity of the hearer ; if it be
plausible, it is the misfortune of the party wronged,
caveat emptor being the rule of law in such case.    A
naked lie may, however, be evidence of the 'design' or
'intent' spoken of in the act, and then it becomes of
much importance to the case.    I do not consider a mere
lie, unaccompanied by acts, calculated to establish the
third part of the offence as above described, and bring
the crime within the statute.    There must be some false
pretence, or in the language of Spencer, who defines
pretences as 'the act of showing or alleging what is
not real,' some positive or apparent thing done, which,
while it adds to the falsity, shows also the intent to
cheat and defraud, and the design of doing so by the
token or pretence used to effect it."

In this instance the falsehood and the pretence are
united so intimately, that it is difficult to divide them.
Under the decision already referred to, in Smith case,
a legal definition is given to a false pretence, as follows :

"I consider a false token or pretence to be, that which
produces a belief in the party wronged, that the fraud
about to be effected is bona fide, true, to be credited or
relied on, as just or genuine."

That belief cannot be raised by a mere naked lie,
unless it be accompanied by acts or circumstances of
such a character as to produce it.    All the representa-

9*

tions in this case were calculated to create confidence, consequently additional weight and trust were given to the pretence, that induced the payment of the money, which is the basis of this prosecution.

This point has been decided, and this decision is still binding. In the case of the Commonwealth *v.* Hutchinson, judge King says: "Broad, however, as is the phrase 'any false pretence whatever' (the court has misquoted the word, it is *whatsoever*), it still has "a legal limit, beyond which it cannot be carried in this or any other case. It extends no farther than to a case where a party has obtained money or property by falsely representing himself to be in a situation in which he was not, or any occurrence which had not happened to which persons of ordinary character might give credit." And again; in all the cases cited, English and American, the pretences used to obtain the property were false, and to repeat the language of chief justice Thompson, "naturally calculated to deceive and impose upon the prosecutor." That is the criterion by which all such accusations are to be tested. And again, "but that the false pretences in the contemplation of the statute, are such as assert the existence of some fact calculated to impose upon a man of common and ordinary caution, which false pretence creates the credit given to the accused." This is the law, and I am bound to obey it; if this case comes within the lines drawn around the act, Mr. Jones must be held to answer; if not, he must be discharged.

If, according to the decision of judge King, "false pretences," in the contemplation of the statute, are such as assert the existence of some fact calculated to impose

upon a man of ordinary caution, which false pretence, creates the credit given to the accused; and if the assertion as a fact, that some one offered seventy-five dollars, which assertion induced Mr. Sutton to give fifty dollars, and also created the credit given to the accused, and which assertion is false, then I am of opinion that the case is embraced within that "legal limit" which the court have marked out.

How it can be otherwise I do not see, under the law. If the law be defective, it should be amended; but while it remains on the statute book, as a penal enactment, it must be construed, as all similar laws are required to be construed.

It has been contended by the counsel for the defendant, that as the object of the concert was charitable and benevolent, and was one which could not be subservient to any personal or pecuniary benefit to him, and that, as he had also lost a sum of money by its failure, that therefore the criminal intent was negatived. This is plausible, but not sound. It may do in ethics, but not in law; carry out the principle, and see where it leads: suppose a trustee of funds should take from the trust estate, in connexion with a fellow trustee or other person interested, at the instance of a third party, a large or small sum of money, and bestow it on the most charitable object, and thus defraud the rightful owner thereof; would not such an act render such persons guilty of a crime—one well known to our laws; would the defence avail before a jury, that the object to which this money was applied, was benevolent or philanthropic? It matters not, therefore, how laudable the institution, or how patriotic the object to be bene-

fited by the money obtained from Sutton; if it was obtained by a false pretence, it is a crime. The design was to obtain the money, the intent was to deceive by representations known not to be true—although the funds so procured may have had the best possible destination.

No part of this fifty dollars was ever received by either the prisoners or soldiers; the whole was spent in effecting the arrangements which were to have been paid out of the private means of the defendant; he, therefore, saved to himself, by the aid of this sum, the loss of an additional fifty dollars; they were, therefore, appropriated, at last, to the use of the defendant.

It is my opinion that the false representations or pretence made to Sutton, and the obtaining the money, are such as to support the belief that the intent was designedly to deceive; at all events, it creates the strongest probable cause for such belief. From all the authorities, and particularly from the decision of judge King, no room is left for technical speculations. The decision in this case must be in accordance with my application of the law to the facts, as clearly, undeniably proven, by the most respectable witnesses.

However much I regret, and deeply regret, too, if a magistrate can entertain such feelings in the discharge of duty, in requiring a respectable, or any other citizen, to give bonds for his appearance before the proper tribunal for trial; yet, as I clearly believe it my duty so to do, no considerations can control or weaken its requirements. It is, therefore, ordered that J. S. Jones enters into good and sufficient security, in the sum of $300, conditioned for his appearance at the next term of the court of quarter sessions, to answer.

Note.—In the case of the Commonwealth *v.* Burdick, which was heard before the Recorder, and resulted in his being held to bail to appear for trial, was subsequently taken up to the supreme court. We have just received the opinion of the chief justice, Gibson, who delivered the opinion of the court on January 19, 1846.

The synopsis of the case is as follows:

" The false assertion of possession of money, on the credit whereof goods were obtained, is a false pretence within the act of July 12, 1842." We extract the concluding portion of the opinion.

" Now the defendant is charged in the indictment before us, with having wilfully misrepresented that he had a capital of $ 8000 in right of his wife; that a part of it was already received; that another part would be received in the course of a month; and that the residue would be received shortly afterwards: and if as was said in Wilchell's case, 2 East P. C. 80, false pretence was within the English statute, wherever it has been the efficient cause of obtaining credit, the false pretence before us is within our own."

We have thought it proper to notice this case here, because the reader, by consulting the opinion of the supreme court in extenso, will find what are the views of this court, on the subject of the false pretence statute of 1842.

We will give one other extract from the opinion. " But," says the chief justice, " I think it at least doubtful whether a naked lie, by which credit has been gained, would not in every case be deemed within our statute which declares it a cheat to obtain money or goods by any false pretences *whatsoever.*"

It will be seen from the above, that the supreme court have given an enlarged, rather than a restricted, interpretation to the statute.